## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

TSMA FRANCHISE SYSTEMS, INC.,   )
     Plaintiff,                )
                            )
v.                            )    **Case No. 20-cv-11088**
                            )
TS OF KINGS HIGHWAY INC. and   )    **DEFENDANTS' AMENDED ANSWER,**
SEAN NOLAN,               )    **SEPARATE DEFENSES,**
     Defendants.            )    **COUNTERCLAIM AND THIRD-**
                            )    **PARTY COMPLAINT**
-------------------------------------------------- )
TS OF KINGS HIGHWAY INC. and   )
SEAN NOLAN,               )
     Counterclaimants/Third-Party  )
     Plaintiffs,             )
                            )
v.                            )
                            )
TSMA FRANCHISE SYSTEMS, INC.,   )
     Counterclaim Defendant,     )
                            )
and                          )
                            )
DANIEL SCHULMANN, ANTHONY   )
VISCOVICH, BRYAN GOTTHOFFER,  )
MIKE SACHS, DINA COSTA and RAY  )
ROUSA,                       )
     Third-Party Defendants.     )
_____)

Defendants, TS of Kings Highway Inc. and Sean Nolan ("Defendants"), by and through their attorneys and by way of Amended Answer to the Complaint, say:

### AS TO THE PARTIES

1.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 1 of the Complaint, and therefore leaves Plaintiff to its proofs.

2.      Defendants admit only that Defendant, TS of Kings Highway Inc., is and was at all relevant times a corporation duly organized and existing under the laws of the State of New York and operated as a Tiger Schulmann Martial Arts franchisee at the Premises.  Except as specifically admitted herein, Defendants deny the allegations set forth in Paragraph 2 of the Complaint.

3.      Defendants admit the allegations set forth in Paragraph 3 of the Complaint.

4.      Defendants deny the allegations set forth in Paragraph 4 of the Complaint.

5.      Defendants make no response to the allegations set forth in Paragraph 5 of the Complaint, as they are legal conclusions to which no response is required.  To the extent the allegations set forth in Paragraph 5 can be construed as requiring a response, Defendants deny same.

## AS TO FACTS COMMON TO ALL COUNTS

6.      Defendants admit that the Franchise Agreement speaks for itself.

7.      Defendants admit that the Franchise Agreement speaks for itself but deny that the cited provision applies in light of facts that will be adduced through discovery.

8.      Defendants admit that the Franchise Agreement speaks for itself but deny that the cited provision applies in light of facts that will be adduced through discovery.

9.      Defendants admit that the Franchise Agreement speaks for itself but deny that the cited provision applies in light of facts that will be adduced through discovery.

10.      Defendants admit that the Franchise Agreement speaks for itself but deny that the cited provision applies in light of facts that will be adduced through discovery.

11.      Defendants admit that the Franchise Agreement speaks for itself but deny that the cited provision applies in light of facts that will be adduced through discovery.

12.     Defendants admit that the Software License Agreement speaks for itself.

13.     Defendants admit that the Software License Agreement speaks for itself but deny that the cited provision applies in light of facts that will be adduced through discovery.

14.     Defendants admit that the Software License Agreement speaks for itself but deny that the cited provision applies in light of facts that will be adduced through discovery.

15.     Defendants admit that the Software License Agreement speaks for itself but deny that the cited provision applies in light of facts that will be adduced through discovery.

16.     Defendants admit that the Software License Agreement speaks for itself but deny that the cited provision applies in light of facts that will be adduced through discovery.

17.     Defendants admit that the Guarantee speaks for itself but deny that the cited provision applies in light of facts that will be adduced through discovery.

18.     Defendants admit that the Confidentiality/Non-Competition Agreement speaks for itself but deny that the cited provision applies in light of facts that will be adduced through discovery.

19.     Defendants are without sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 19 of the Complaint, and therefore leaves Plaintiff to its proofs.

**AS TO DEFENDANTS BREACH THE FRANCHISE AGREEMENT AND SLA**

20.     Defendants admit that Franchisee operated the Franchised Business at the location. Except as specifically admitted here, Defendants deny the allegations set forth in Paragraph 20 of the Complaint.

21.     Defendants deny the allegations set forth in Paragraph 21 of the Complaint.

22.     Defendants deny the allegations set forth in Paragraph 22 of the Complaint.

23.     Defendants deny the allegations set forth in Paragraph 23 of the Complaint.

**AS TO NOTICE OF DEFAULT AND TERMINATION OF FRANCHISE**

24.     Defendants admit that the referenced letter, dated June 30, 2020, speaks for itself but deny that any purported termination was proper under the Franchise Agreement and controlling law.  Except as specifically admitted herein, Defendants deny the allegations set forth in Paragraph 24 of the Complaint.

25.     Defendants admit that the referenced letter, dated June 30, 2020, speaks for itself but deny that any purported termination was proper under the Franchise Agreement and controlling law.  Except as specifically admitted herein, Defendants deny the allegations set forth in Paragraph 25 of the Complaint.

26.     Defendants deny the allegations set forth in Paragraph 26 of the Complaint.

27.     Defendants deny the allegations set forth in Paragraph 27 of the Complaint.

**AS TO FIRST COUNT**
**(Breach of Contract)**

28.     Defendants repeat and incorporate by reference their responses to Paragraphs 1 through 27 of the Complaint as if fully set forth at length herein.

29.     Defendants admit that the Franchise Agreement and SLA speak for themselves. Except as specifically admitted herein, Defendants deny the allegations set forth in Paragraph 29 of the Complaint.

30.     Defendants admit that the Guarantee speaks for itself.  Except as specifically admitted herein, Defendants deny the allegations set forth in Paragraph 30 of the Complaint.

31.     Defendants admit only that the referenced documents speak for themselves but deny that the cited provisions apply in light of facts that will be adduced through discovery.

4

Except as specifically admitted herein, Defendants deny the allegations set forth in Paragraph 31 of the Complaint.

32.    Defendants deny the allegations set forth in Paragraph 32 of the Complaint.

33.    Defendants deny the allegations set forth in Paragraph 33 of the Complaint.

34.    Defendants deny the allegations set forth in Paragraph 34 of the Complaint.

35.    Defendants deny the allegations set forth in Paragraph 35 of the Complaint.

**AS TO SECOND COUNT**
**(Unjust Enrichment)**

36.    Defendants repeat and incorporate by reference their responses to Paragraphs 1 through 35 of the Complaint as if fully set forth at length herein.

37.    Defendants deny the allegations set forth in Paragraph 37 of the Complaint.

38.    Defendants deny the allegations set forth in Paragraph 38 of the Complaint.

39.    Defendants deny the allegations set forth in Paragraph 39 of the Complaint.

40.    Defendants deny the allegations set forth in Paragraph 40 of the Complaint.

**AS TO THIRD COUNT**
**(Preliminary and Permanent Injunction)**

41.    Defendants repeat and incorporate by reference their responses to Paragraphs 1 through 40 of the Complaint as if fully set forth at length herein.

42.    Defendants deny the allegations set forth in Paragraph 42 of the Complaint.

43.    Defendants deny the allegations set forth in Paragraph 43 of the Complaint.

44.    Defendants deny the allegations set forth in Paragraph 44 of the Complaint.

**AS TO FOURTH COUNT**
**(Declaratory Judgment)**

45.    Defendants repeat and incorporate by reference their responses to Paragraphs 1 through 44 of the Complaint as if fully set forth at length herein.

46.    Defendants admit only that the Franchise Agreement speaks for itself but deny that the cited provisions apply in light of facts that will be adduced through discovery.  Except as specifically admitted herein, Defendants deny the allegations set forth in Paragraph 46 of the Complaint.

47.    Defendants admit only that the Franchise Agreement speaks for itself but deny that the cited provisions apply in light of the facts that will be adduced through discovery. Except as specifically admitted herein, Defendants deny the allegations set forth in Paragraph 47 of the Complaint.

48.    Defendants deny the allegations set forth in Paragraph 48 of the Complaint.

49.    Defendants deny the allegations set forth in Paragraph 49 of the Complaint.

50.    Defendants deny the allegations set forth in Paragraph 50 of the Complaint.

51.    Defendants deny the allegations set forth in Paragraph 51 of the Complaint.

52.    Defendants deny the allegations set forth in Paragraph 52 of the Complaint.

53.    Defendants deny the allegations set forth in Paragraph 53 of the Complaint.

54.    Defendants deny the allegations set forth in Paragraph 54 of the Complaint.

## SEPARATE DEFENSES AND OTHER RESPONSIVE MATTERS

In further response to the allegations set forth in the Complaint, Defendants state as follows:

### AS AND FOR A FIRST SEPARATE DEFENSE

Plaintiff's Complaint fails to state a cause of action.

### AS AND FOR A SECOND SEPARATE DEFENSE

Plaintiff's Complaint must be dismissed due to insufficiency of process.

## AS AND FOR A THIRD SEPARATE DEFENSE

Plaintiff's Compliant must be dismissed based on deficient service of process.

## AS AND FOR A FOURTH SEPARATE DEFENSE

Plaintiff failed to mitigate its damages, if any.

## AS AND FOR A FIFTH SEPARATE DEFENSE

Plaintiff's claims are barred by the doctrine of laches.

## AS AND FOR A SIXTH SEPARATE DEFENSE

Plaintiff's claims are barred by the doctrine of waiver.

## AS AND FOR A SEVENTH SEPARATE DEFENSE

Plaintiff's claims are barred by the doctrine of estoppel.

## AS AND FOR AN EIGHTH SEPARATE DEFENSE

Plaintiff is barred from any recovery in this action and estopped from seeking the requested relief and recovery by its own acts, omissions, and course of conduct.

## AS AND FOR A NINETH SEPARATE DEFENSE

Plaintiff's Complaint is barred by the doctrine of unclean hands.

## AS AND FOR A TENTH SEPARATE DEFENSE

Plaintiff's Complaint is barred by Plaintiff's own material breach of contract.

## AS AND FOR AN ELEVENTH SEPARATE DEFENSE

This lawsuit was not commenced by Plaintiff within the time prescribed by law and Plaintiff, therefore, is barred from recovery pursuant to applicable statutes of limitations.

### AS AND FOR A TWELFTH SEPARATE DEFENSE

Plaintiff's Complaint is barred by Plaintiff's failure to fulfill various conditions precedent to recovery.

### AS AND FOR A THIRTEENTH SEPARATE DEFENSE

Plaintiff's Complaint is barred by Plaintiff's own unconscionable conduct.

### AS AND FOR A FOURTEENTH SEPARATE DEFENSE

The claims for damages have not accrued, are purely speculative, uncertain, and contingent.

### AS AND FOR A FIFTEENTH SEPARATE DEFENSE

None of the alleged injury or damage was foreseeable at the time of the alleged acts or omissions in Plaintiff's Complaint.

### AS AND FOR A SIXTEENTH SEPARATE DEFENSE

Plaintiff's claims are barred because of Plaintiff's failure to join necessary and indispensable parties.

### AS AND FOR A SEVENTEENTH SEPARATE DEFENSE

Upon information and belief, Plaintiff lacks the capacity, standing or authority to bring this action, in whole or in part.

### AS AND FOR AN EIGHTEENTH SEPARATE DEFENSE

Defendants will rely upon any and all other further defenses which become available or appear during discovery proceedings in this action and hereby specifically reserve the right to amend their Amended Answer for the purposes of asserting any such additional separate defenses.

### AS AND FOR A NINETEENTH SEPARATE DEFENSE

There is no justiciable issue or controversy.

### AS AND FOR A TWENTIETH SEPARATE DEFENSE

Plaintiff is not entitled to recovery because Defendants were justified in its conduct and acts.

### AS AND FOR A TWENTY-FIRST SEPARATE DEFENSE

If Plaintiff suffered damages as alleged, which Defendants deny, such damages either resulted from its own actions or the actions of another servant or others for whom Defendants are not responsible.

### AS AND FOR A TWENTY-SECOND SEPARATE DEFENSE

Plaintiff's claims fail because it was not damaged by any act of Defendants.

### AS AND FOR A TWENTY-THIRD SEPARATE DEFENSE

Plaintiff's claims are barred by the economic loss doctrine.

### AS AND FOR A TWENTY-FOURTH SEPARATE DEFENSE

Defendants are not liable for any breach of contract or misrepresentation.

### AS AND FOR A TWENTY-FIFTH SEPARATE DEFENSE

Defendants breached no duty to Plaintiff.

### AS AND FOR A TWENTY-SIXTH SEPARATE DEFENSE

Defendants assert all defenses, limitations, and restrictions available to them under the New York Franchise Sales Act, N.Y. Gen Bus Law §§ 680, et seq. and/or the New Jersey Franchise Practices Act, N.J.S.A. §§ 56:10-1, et seq.

## AS AND FOR A TWENTY-SEVENTH SEPARATE DEFENSE

Defendants reserve the right to assert any and all other defenses, both factual and legal, as may be justified by information later obtained.

## COUNTERCLAIM AND THIRD-PARTY COMPLAINT

### Parties

1.      Defendant/Counterclaimant/Third-Party Plaintiff, TS of Kings, is a New York corporation with its principal place of business located in New York.

2.      Defendant/Counterclaimant/Third-Party Plaintiff, Sean Nolan, is an individual residing in North Carolina.

3.      Upon information and belief, Plaintiff/Counterclaim Defendant, TSMA Franchise Systems, Inc., is a Florida corporation with its principal place of business in Florida.

4.      Upon information and belief, Third-Party Defendant, Daniel Schulmann, is an individual residing in Florida.

5.      Upon information and belief, Third-Party Defendant, Anthony Viscovich, is an individual residing in New York.

6.      Upon information and belief, Third-Party Defendant, Bryan Gotthoffer, is an individual residing in New York.

7.      Upon information and belief, Third-Party Defendant, Mike Sachs, is an individual residing in Florida.

8.      Upon information and belief, Third-Party Defendant, Dina Costa, is an individual residing in New Jersey.

9.      Upon information and belief, Third-Party Defendant, Ray Rousa, is an individual residing in New Jersey.

**Jurisdiction and Venue**

10.     This Court has subject matter jurisdiction over Plaintiff's Complaint and Defendants' Counterclaim pursuant to 28 U.S.C. § 1332(a), as there is complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds $75,000.

11.     This Court has supplemental jurisdiction over the additional claims in this action, including the Third-Party Complaint, pursuant to 28 U.S.C. § 1367(a).

12.     Venue is proper in this Court with regard to Plaintiff's Complaint and Defendants' Counterclaim because the agreement between Plaintiff and Defendants designates the state or federal court situated in Bergen County, New Jersey as the venue for any disputes between the parties.

13.     Venue is proper in this Court as to the Third-Party Complaint pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the claims occurred in this District.

**A.     Sean Nolan's Purchase of an Interest in the Bensonhurst Franchise**

14.     Beginning in 2002, Defendant, Sean Nolan, began training at the Bayside, Queens location of Tiger Schulmann's under its owner/head instructor Bryan Gotthoffer.

15.     From 2007 through December of 2009, Sean Nolan worked for Gotthoffer at the Bayside location as a manager/instructor, learning the business from Gotthoffer and completing Tiger Schulmann's "Instructor Training Program."

16.     In December of 2009, Daniel Schulmann told Sean Nolan that because of his excellent performance as a manager and instructor in Bayside, there was an opportunity for him to become an owner/operator of the Bensonhurst Tiger Schulmann's location.

17.     Before Sean Nolan became an owner of the Bensonhurst location, it was operated by two owners/partners, Anthony Viscovich and Will Malloy.

18.     When Sean Nolan became an owner of the Bensonhurst location, he was told by Plaintiff's predecessor that his partner would be Mr. Schulmann's cousin, Nissim Levy, with Nolan purchasing Viscovich's interest for $200,000 and Levy taking over Malloy's.  Defendants remain unaware of the sum paid by Levy for an ownership interest equal to Nolan's.

19.     Under the Joint Venture Franchise Agreement at the time, Daniel Schulman owned 51% of each location and would receive 50% of the net profits, leaving Nolan and Levy each with a 25% interest in the Bensonhurst location.

20.     In December of 2009, in reliance upon numerous false and fraudulent representations made by Plaintiff/Counterclaim Defendant and Third-Party Defendants designed to induce Sean Nolan to become encumbered with purported debt, Sean Nolan borrowed $50,000 from Bryan Gotthoffer as a down payment for Viscovich's interest in the Bensonhurst location. At that time, Sean Nolan executed purported promissory notes (the "Notes") to Gotthoffer for the $50,000 down payment and to Viscovich in the amount of $150,000, the remainder of the $200,000 purchase price.  The Notes were prepared by Plaintiff's predecessor's attorney.

21.     In order to induce Defendant Nolan to enter into the Notes, Plaintiff's predecessor and its principals and agents, including, but not limited to Third-Party Defendants made fraudulent misrepresentations regarding:

    a.    the value of the Bensonhurst location;

    b.    their respective interests in the Bensonhurst location;

    c.    the valuation of Mr. Nolan's anticipated interest in the Bensonhurst location;

   d.  the actual amount of Mr. Nolan's ownership interest, as distinguished from what they would represent to the government and to the outside world; and

   e.  anticipated revenue and profits to be generated by the Bensonhurst location.

22. Upon information and belief, Mr. Nolan was fraudulently induced to enter into the Notes in order to burden him with unreasonable debt from the outset and to ensure that Plaintiff's predecessor and its principals and agents could avoid their obligation to share profits with him, deprive him of the value of his franchise ownership interest, and to ensure their ability to draw on the significant revenue stream derived from his talents whenever they pleased.

23. In December of 2009, Sean Nolan also executed the purported Joint Venture Franchise Agreement, which document was also prepared by Plaintiff's predecessor's attorney.

24. Defendant, Sean Nolan, was also fraudulently induced to execute the Joint Venture Franchise Agreement by fraudulent misrepresentations by Plaintiff's predecessor and its principals and agents, including, but not limited to Third-Party Defendants, regarding:

   a.  the value of the Bensonhurst location;

   b.  their respective interests in the Bensonhurst location;

   c.  the valuation of Mr. Nolan's interest in the Bensonhurst location;

   d.  the actual amount of Mr. Nolan's ownership interest, as distinguished from what they would represent to the government and to the outside world; and

   e.  anticipated revenue and profits to be generated by the Bensonhurst location.

25. In spring of 2010, only months after Nolan and Levy took over the Bensonhurst location, Plaintiff's predecessor changed the business model and accounting method for all franchises, including the franchise operated by Sean Nolan, which led to a substantial decline in revenue and profits for all franchise owners.

26.    Under the original business model, students would purchase "class-based programs" under which a franchise would recognize 100% of the cash it collected for the number of classes it sold in a month.

27.    In the spring of 2010, Plaintiff's predecessor changed to a "subscription-based" business model under which students would be able to take unlimited classes for a flat monthly fee.  As a result, if a student paid in advance for a one-year subscription, the franchise would recognize only a fraction of the revenue in the month it was paid, and the remainder would only be earned in future months as services were provided.  Under the new business model, accrued revenue would build in an account that was managed solely by Plaintiff's predecessor.

28.    The effect of this change in business model was to deprive Mr. Nolan of the income and value he was led to believe he would receive by Plaintiff's predecessor and its principals' and agents' representations regarding the value of the Bensonhurst location, Mr. Nolan's interest in the Bensonhurst location, the value of Mr. Nolan's interest in the Bensonhurst location, and the viability and anticipated revenue and profits of the Bensonhurst location.

29.    Because of the effect of this change on the Bensonhurst franchise's accounting and earnings, Gotthoffer and Viscovich verbally agreed to modify the purported Notes thereby allowing Nolan to pay if and when he could.  In continued reliance upon Plaintiff/Counterclaim Defendant's and Third-Party Defendants' (and their principals' and agents') fraudulent statements and other misconduct, Nolan continued to pay when he could, ultimately repaying $80,994.86 on the purported Notes.

30.    During Nolan's ownership of the Bensonhurst location, Nolan received numerous requests from the landlord to cure pre-existing NYC Department of Buildings violations on the

Bensonhurst building, including a violation stating that the building was not zoned for a "Physical Culture Establishment."

31.     Plaintiff's predecessor and its principals and agents also made fraudulent misrepresentations regarding their intent, willingness, and ability to resolve the zoning issue.  At the time that Nolan signed the Joint Venture Franchise Agreement, Plaintiff's predecessor's attorney, Scott Levensen, told him that the zoning violation was not a problem and that Plaintiff's predecessor would take care of it, but Plaintiff's predecessor never did so.   The Bensonhurst location was fined as a result of this failure to rectify the zoning violation.

32.     Unbeknownst to Sean Nolan when he relied upon the fraudulent misrepresentations by Plaintiff/Counterclaim Defendant and Third-Party Defendants (and their principals and agents), the Bensonhurst location was opened originally without proper zoning approval from the outset.   Third-Party Defendant Sachs later admitted that he and other Plaintiff/Counterclaim Defendant principals knew that the site was not properly compliant with zoning requirements, and that they proceeded to operate the location despite that known failure to comply.

33.     As a result of fraudulent statements by Plaintiff's predecessor and its principals and agents, including, but not limited to Daniel Schulmann and Levensen, that Plaintiff's predecessor would handle the zoning violation, Defendant, Sean Nolan, was induced to purchase an interest in the Bensonhurst location and to enter into the purported Notes in order to obtain that interest.

34.     In filings with the IRS, Plaintiff's predecessor claimed that Nolan had a 49% ownership interest in Bensonhurst in 2010, when, in fact, Nolan only owned, and was paid as if he had, a 25% interest in the location.

35.    In filings with the IRS, Plaintiff's predecessor claimed that Nolan owned a 99% interest in Bensonhurst in 2011 and 2012 when, in fact, Nolan only owned, and was paid as if he had, a 25% interest in the location.

36.    In early 2012, without any input from Sean Nolan, Plaintiff's predecessor decided to close the Bensonhurst location, in part because of the continuing zoning violation, and to split up Levy and Nolan.

37.    Levy was given an already-active, thriving location in Bay Ridge and Nolan was told that his new location would be a brand new location in Midwood, Brooklyn.

38.    When Bensonhurst shut down, Gotthoffer and Viscovich again confirmed their agreement to forgo any payments on the purported Notes until such time as Nolan could get back on his feet.  Nolan spent much of 2012 working for Viscovich at the Astoria, Queens Tiger Schulmann's location.

39.    In addition to other fraudulent misrepresentations, Plaintiff's 2018 Franchise Disclosure Document misrepresented that Bensonhurst was a company-owned location, thereby denying Nolan's 25% interest in Bensonhurst.

**B.    Sean Nolan Opens the Midwood Location**

40.    The Midwood, NY location opened in December of 2012.

41.    Daniel Schulmann paid the security deposit and first and last month's rent for the Midwood location, which Defendants paid back within months after opening, an amount totaling $32,750.

42.    While Defendants were responsible for certain costs relating to the buildout of the Midwood location, all of which were promptly repaid by Defendants, other costs fell within the landlord's work allowance and were not Defendants' responsibility.

16

43.     Contrary to the agreement and understanding and Plaintiff's predecessors and its principals' and agents' representations, Plaintiff's predecessor, through former controller Ray Rousa, misrepresented that Defendants were responsible for certain buildout costs included in the landlord's work-allowance and required Defendants to repay those amounts.

44.     Given the concerted effort by Plaintiff/Counterclaim Defendant and its principals and agents to deprive Defendants of their rightful share of profit, requiring Defendants to be responsible for the buildout cost for the Midwood location was a further effort by Plaintiff's predecessor and its principals and agents to ensure that Mr. Nolan was encumbered with significant debt that would allow them to avoid their obligation to share profits with him, to deprive him of the value of his franchise, and to ensure their ability to draw on his talents and revenue stream whenever they pleased without fairly compensating Defendants.

45.     In the spring of 2014, Nolan met with Gotthoffer, Viscovich, Daniel Schulmann and other executives of Plaintiff's predecessor to discuss payment on the purported Notes.

46.     At that meeting, Schulmann admitted that Nolan had paid too much to acquire Nolan's interest in Bensonhurst and asked how that happened.  Nolan reminded Schulmann that he had approved and dictated the terms of the deal in December of 2009.

47.     Schulmann also told Viscovich and Gotthoffer that they should not charge Nolan interest on the purported Notes.  Upon information and belief, that gesture was nothing more than an attempt to hide Schulmann's pivotal role in the illicit scheme to deprive Sean Nolan of his rightful share of profits.

48.     At that meeting, and in reliance upon the numerous fraudulent statements and omissions perpetrated by Plaintiff/Counterclaim Defendant and its principals and agents, Nolan agreed to begin making $500 monthly payments to Viscovich and to begin making $250 monthly

payments to Gotthoffer beginning in the spring of 2015.  Gotthoffer requested that the payments be hand-delivered or otherwise delivered in a manner to ensure that his wife would be unaware of the payments.

49.     The aforementioned meeting and the insistence that Mr. Nolan begin making payment on the purported Notes was, upon information and belief, in furtherance of Plaintiff's predecessor and its principals' and agents' ongoing scheme to ensure that Mr. Nolan was encumbered with significant debt that would allow them to avoid their obligation to share profits with him, to deprive him of the value of his franchise, and to ensure their ability to draw on his talents and revenue stream whenever they pleased.

50.     Nolan continued to run the Midwood franchise as a top-producing school in the organization until July 1, 2020, when he received a Termination of Franchise notice from Plaintiff.

51.     Pursuant to the Joint Venture Franchise Agreement applicable to the Midwood location, Defendants owned 49% of the franchise and Daniel Schulmann owned the remaining 51% for the first seven years of the arrangement, beginning in 2012.

52.     Contrary to the terms of the Joint Venture Franchise Agreement, Plaintiff and its predecessor reported to the IRS that Defendants owned the following percentages of the Midwood franchise:

a.      2012:  99.5%

b.      2013:  99.5%

c.      2014:  99.5%

d.      2015:  99.5%

e.      2016:  99.5%

f.      2017:  99.5%

g.      2018:  99.528767%

### C.      The Bensonhurst Lawsuit and Settlement

53.      In the summer of 2017, the landlord of the Bensonhurst location sued Daniel Schulmann in his capacity as guarantor on the lease for failing to satisfy Bensonhurst's obligations under the lease.

54.      That litigation was ultimately settled for $190,000.

55.      Although Defendant, Sean Nolan, at the request of Plaintiff's predecessor's former attorney, Scott Levenson, gave a deposition in the litigation, he did not otherwise participate and the decision to settle the litigation was made entirely by Daniel Schulmann and Plaintiff's predecessor and its principals and agents.

56.      The settlement payment was only made as a result of the negligence, ineptitude, and/or fraudulent misrepresentations of Plaintiff's predecessor and its principals and agents, including, but not limited to misrepresentations by Daniel Schulmann and Scott Levenson that the zoning issue would be resolved and their failure to resolve it.

57.      Thereafter, despite being solely responsible for the zoning problems and ensuing lawsuit, settlement and resultant liability, Plaintiff and its predecessor took the position that Nolan was liable for 50% of that settlement, i.e., $95,000, which share Plaintiff offered to "reduce" to $47,500 pursuant to a proposed Repayment Agreement.

58.      The position taken by Plaintiff and its predecessor is contrary to Plaintiff's representation in its 2018 Franchise Disclosure Document that the Bensonhurst location was company-owned and lays bare Plaintiff and its principals and agents' scheme to encumber Sean Nolan with improper debt obligations in furtherance of their fraudulent scheme.

59.    Nolan refused to sign the Repayment Agreement, because it was wholly improper and the result of Plaintiff's and its principals' and agents' malfeasance, and he told Mr. Schulmann that he did not have the money to pay.

60.    Schulmann told Nolan that the money would be taken out of Midwood's deferred revenue/pre-paid student tuition.

61.    Plaintiff's predecessor and its principals and agents improperly placed this additional financial burden on Mr. Nolan in order to encumber him with additional debt in furtherance of their scheme to ensure that Mr. Nolan was encumbered with significant debt that would allow them to avoid their obligation to share profits with him, to deprive him of the value of his franchise, and to ensure their ability to draw on his talents and revenue stream whenever they pleased.

62.    Defendant Nolan paid $15,000 of the $47,500 that Plaintiff's predecessor baselessly claimed that he owed due to the duress Mr. Nolan was under given the impact of the noted fraudulent scheme herein described.

63.    Nolan also paid $500 to Plaintiff's predecessor's attorney Scott Levenson to represent him in connection with a deposition in the litigation.

**D.    Plaintiff's New Franchise Structure Takes Effect**

64.    In the spring of 2018, Plaintiff and its predecessor restructured the entire Tiger Schulmann's franchise system under a new franchise agreement.

65.    In connection with that restructuring, franchisees were told that they would have to buy out the 51% ownership stake that Daniel Schulmann had held under the previous franchise agreement pursuant to a valuation performed by Plaintiff's CFO.

66.    The valuation of the Midwood location resulted in a buyout price of $192,209.

67.     Nolan complained to Schulmann that the buyout was too high, especially in light of the Notes for Bensonhurst and the portion of the Bensonhurst settlement that Plaintiff was claiming he owed, and Schulmann agreed to give Nolan a "credit" of $23,750.

68.     Even with the so-called "credit," this buyout placed yet another financial obligation on Defendants in furtherance of Plaintiff, its predecessor, and its principals and agents' scheme to ensure that Mr. Nolan was encumbered with significant debt that would allow them to avoid their obligation to share profits with him, to deprive him of the value of his franchise, and to ensure their ability to draw on his talents and revenue stream whenever they pleased.

69.     Under the new franchise structure, there were two bank accounts for each location:  a Sterling Bank depository account over which Plaintiff had sole control and into which all gross revenue from Defendants' location was deposited and a Bank of America operating account for school expenses and payroll, which the franchisee had complete control over.

70.     Every week Plaintiff would deduct the 19.5% of gross revenue that it was to receive under the franchise agreement and transfer the remaining 80.5% of gross revenue from the Sterling account to the franchisee's Bank of America operating account and leave the franchisee responsible for its own accounting and bookkeeping, whereas under the previous system, Plaintiff's predecessor had handled all such accounting.  In addition, at the beginning of each month, this transfer would include any deferred payments that were due to the franchisee for that month (e.g., for pre-paid annual subscriptions).

### E.     The COVID-19 Pandemic

71.     On March 16, 2020, Defendants were ordered by the City of New York to cease operations because of the COVID-19 pandemic.

72.     On the same day, Mr. Nolan reached out to the landlord at the Midwood location to see whether they would be willing to explore the possibility of rent modification.  When the landlord refused, but instead stated that they would be willing to release Defendants from the lease, Mr. Nolan began looking for another location with Plaintiff's knowledge and assistance.

73.     As the shutdown continued, Defendants started teaching students via Zoom, but the Midwood franchise received a significant number of cancellation requests, which resulted in a precipitous drop in income for the location.

74.     During web conferences with all franchisees in late March and April of 2020, Daniel Schulmann stated that, given the continuing COVID-related shutdown and resulting loss of revenue, Plaintiff would not charge the transition fee/buyout payment for March and April of 2020 and instead add those payments to the end of the payment schedule.

75.     During web conferences in May of 2020, Plaintiff directed franchisees to withhold rent payments and utility payments in order to have as much cash on hand as possible in order to weather the shutdown, as the general direction from Plaintiff was that landlords would not be able to do anything to franchisees during the shutdown.

76.     During this time period, Plaintiff also directed franchisees to furlough all employees and have them apply for unemployment, but also to have those same employees "volunteer for job security," teaching Zoom classes while collecting unemployment, with the implication that if they did not comply, they would not be rehired after the COVID-19 shutdown ended.

22

77.    On June 5, 2020, Defendants were expecting the usual Friday transfer of funds into the Bank of America operating account but that transfer did not come.

78.    When Defendants inquired regarding the transfer on June 5, 2020, Plaintiff's controller, Dina Costa, represented that there was an "issue" with the transfer file.

79.    On Monday, June 8, instead of the $12,696 that Defendants expected, they received only $978.88.

80.    During this time, Plaintiff and its principals and agents continued to make fraudulent misrepresentations about the reasons for their inability to pay the amount due until, on June 9, 2020, Plaintiff, through Dina Costa and Mike Sachs, advised that the remaining money could not be transferred from the Sterling account because there was not enough funds in the account to clear it.

81.    In an ensuing telephone conference with Plaintiff's CFO, Defendants were advised that the lack of adequate balance was the result of the remaining $32,500 that was still owed on the Bensonhurst settlement.  Plaintiff's CFO encouraged Defendants to transfer the PPP loan money Defendants had received for the rent money they had been withholding into the Sterling account, which Defendants refused to do, as they intended to use that money for the buildout of the new location that Defendants had been working with Plaintiff to find.

82.    Based upon Defendants' calculations, even if they owed $32,500, there should have been roughly $23,000 available in the Sterling account based upon deferred income that was due to accrue between June of 2020 and February of 2021.  Despite multiple inquiries, Defendants received no response regarding where this money was and why it was not available to cover the remainder of the transfer into the Bank of America operating account.

83.     Upon reviewing their records, Defendants identified unusual transfer patterns in the Sterling accounting whereby Plaintiff would sometimes take nearly double what had been earned, effectively giving itself a 0% interest loan on pre-paid student tuition that had not been earned yet, as well as blatant errors in accounting practices.  Defendants also discovered that Plaintiff was taking Defendants' buyout/transition payments early before they became due.

84.     In mid-June of 2020, Defendants executed a release with the landlord at the Midwood location and closed the brick and mortar location, but continued to provide classes for students via Zoom.

85.     On July 1, 2020, Defendants received Plaintiff's purported Termination of Franchise notice and ceased teaching classes that day.

86.     Plaintiff's pattern of fraudulent misrepresentations continues even in the Termination of Franchise notice, insofar as Plaintiff takes the position that Defendants abandoned the franchise – despite Plaintiff's (and its agents' and principals') actual knowledge that Defendants had continued to provide Zoom classes and that Defendants were working directly with Plaintiff (with Plaintiff's knowledge and consent) to find a new physical location to continue the business after COVID restrictions were lifted.

87.     As set forth above, Third-Party Defendants, including Daniel Schulmann, Anthony Viscovich, Bryan Gotthoffer, Mike Sachs, Dina Costa, and Ray Rousa, actively participated in Plaintiff and its predecessor's scheme to defraud Defendants and should be held personally liable for their active participation in that scheme, and based on their misuse of the corporate entity(ies) to perpetrate a fraudulent scheme.

## FIRST COUNT
**(Breach of Contract)**

88.     Defendants incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth at length herein.

89.     The contracts between Plaintiff and its predecessor and Defendants were valid and enforceable contracts.

90.     Plaintiff and its predecessor breached those agreements by, among other things, misrepresenting Defendants' ownership interests in the Bensonhurst and Midwood entities, failing to make payments to Defendants pursuant to the ownership interests so represented, improperly assigning a portion of the Bensonhurst settlement liability to Defendants, withdrawing money from the Sterling account to which they were not entitled, and improperly seeking to terminate the Midwood franchise.

91.     Defendants have suffered damages as a result of these breaches.

## SECOND COUNT

**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

92.     Defendants incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth at length herein.

93.     The contracts between Plaintiff and its predecessor and Defendants included an implied covenant of good faith and fair dealing.

94.     Plaintiff and its predecessor breached the implied covenant of good faith and fair dealing owed to Defendants by, among other things, misrepresenting Defendants' ownership interests in the Bensonhurst and Midwood entities, failing to make payments to Defendants pursuant to the ownership interests so represented, improperly assigning a portion of the

Bensonhurst settlement liability to Defendants, withdrawing money from the Sterling account to which they were not entitled, and improperly seeking to terminate the Midwood franchise.

95.    Defendants have suffered damages as a result of those breaches.

## THIRD COUNT
### (Fraud)

96.    Defendants incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth at length herein.

97.    Plaintiff, its predecessor, and their principals and agents, including, but not limited to Third-Party Defendants, made material misrepresentations of fact regarding numerous issues as outlined above, including, but not limited to:

a.    the value of the Bensonhurst location;

b.    their respective interests in the Bensonhurst location;

c.    the valuation of Mr. Nolan's interest in the Bensonhurst location;

d.    the actual amount of Mr. Nolan's ownership interest, as distinguished from what they would represent to the government and the outside world;

e.    anticipated revenue and profits to be generated by the Bensonhurst location;

f.    their willingness and ability to resolve the zoning issues at the Bensonhurst location and the fact that Mr. Nolan would not be responsible for such issues;

g.    the extent of Defendants' responsibility for buildout costs for the new Midwood location;

h.    the purported reason for their efforts to terminate Defendants' franchise;

i.    the reasons for their failure to pay Defendants what was due and owing from the Sterling account; and

j.    the improper and wrongful advance loans taken from the Sterling account to Defendants' detriment.

26

98.     Plaintiff, its predecessor, and their principals and agents, including, but not limited to Third-Party Defendants, made those misrepresentations with knowledge that they were false and with the intent that Defendants and others rely on them.

99.     Defendants and others reasonably relied upon Plaintiff and its predecessor's misrepresentations.

100.    Defendants have suffered damages as a result of those misrepresentations.

## FOURTH COUNT
**(Negligent Misrepresentation)**

101.    Defendants incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth at length herein.

102.    Plaintiff, its predecessor, and their principals and agents, including, but not limited to Third-Party Defendants, made negligent misrepresentations of fact regarding numerous issues as outlined above, including, but not limited to:

a.    the value of the Bensonhurst location;

b.    their respective interests in the Bensonhurst location;

c.    the valuation of Mr. Nolan's interest in the Bensonhurst location;

d.    the actual amount of Mr. Nolan's ownership interest, as distinguished from what they would represent to the government and the outside world;

e.    anticipated revenue and profits to be generated by the Bensonhurst location;

f.    their willingness and ability to resolve the zoning issues at the Bensonhurst location and the fact that Mr. Nolan would not be responsible for such issues;

g.    the extent of Defendants' responsibility for buildout costs for the new Midwood location;

h.    the purported reason for their efforts to terminate Defendants' franchise;

i.      the reasons for their failure to pay Defendants what was due and owing from the Sterling account; and

j.      the improper and wrongful advance loans taken from the Sterling account to Defendants' detriment.

103.    Defendants and others reasonably relied upon Plaintiff and its predecessor's misrepresentations.

104.    Defendants have suffered damages as a result of those misrepresentations.

## FIFTH COUNT
### (Conversion)

105.    Defendants incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth at length herein.

106.    The money that Defendants paid allegedly as a result of the Bensonhurst settlement is an identifiable sum of money.

107.    The money that Plaintiff and its principals and agents, including but not limited to Third-Party Defendants, improperly withdrew from the Sterling account is an identifiable sum of money.

108.    The sums of money identified in the preceding paragraphs belonged to Defendants and Defendants have an immediate right to possession of it.

109.    Plaintiff has wrongfully interfered with Defendants' immediate right to possession of the sums of money identified in the preceding paragraphs.

## SIXTH COUNT
### (Tortious Interference with Contract)

110.    Defendants incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth at length herein.

111.     Defendants had protectable interest in their ongoing contractual relationships with their students.

112.     Plaintiff and its principals and agents, including, but not limited to Third-Party Defendants, were aware of that ongoing relationship and intentionally interfered with it, by among other things, improperly attempting to terminate the Midwood franchise.

113.     Such interference with those relationships was without justification.

114.     Defendants have suffered damages as a result of Plaintiff's interference.

## SEVENTH COUNT

### (Tortious Interference with Prospective Economic Advantage)

115.     Defendants incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth at length herein.

116.     Defendants had protectable interest in their prospective relationships with their students.

117.     Plaintiff and its principals and agents, including, but not limited to Third-Party Defendants, were aware of those prospective relationships and intentionally interfered with them, by among other things, improperly attempting to terminate the Midwood franchise.

118.     Such interference with those relationships was without justification.

119.     Defendants have suffered damages as a result of Plaintiff's interference.

## EIGHTH COUNT

### (Trade Libel)

120.     Defendants incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth at length herein.

121.    Plaintiff and its principals and agents, including, but not limited to Third-Party Defendants, published false statements of fact regarding Defendants, including that Defendants had "abandoned" the Midwood franchise.

122.    Plaintiff and its principals and agents, including, but not limited to Third-Party Defendants, published these statements knowing they were false or with reckless disregard for the truth.

123.    Defendants have been damaged as a result of Plaintiff's false statements, including loss of business and damage to their reputation.

## NINTH COUNT

### (Declaratory Judgment)

124.    Defendants incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth at length herein.

125.    There is an actual controversy between the parties with respect to the validity of the purported Notes and the current franchise agreement for the Midwood franchise.

126.    Because the purported Notes were induced by fraud, including, but not limited to, Plaintiff and its predecessor's and their principals' and agents' fraudulent statements regarding the value of the Bensonhurst franchise and Defendants interest in it, Defendants respectfully requests that this Court declare the purported Notes null and void.

127.    Because Plaintiff has breached the Midwood franchise agreement, both actually and anticipatorily, by, among other things, improperly withdrawing money from the Sterling account that it was not entitled to and attempting to terminate the franchise, Defendants respectfully request a declaration that the franchise agreement is null and void.

**WHEREFORE**, Defendants respectfully request that this Court enter judgment in their favor and against Plaintiff and Third-Party Defendants as follows:

a.    Awarding Defendants compensatory and other damages;

b.    Declaring that the Notes are null and void;

c.    Declaring that the Midwood franchise agreement is null and void;

d.    Awarding such other relief as the Court deems just and proper.

### JURY DEMAND

Defendants hereby demand a trial by jury as to all issues contained herein.

Dated:  September 15, 2020

*s/ Matthew J. Tharney*
Matthew J. Tharney
**SATTIRAJU & THARNEY, LLP**
50 Millstone Road
Building 300, Suite 202
East Windsor, New Jersey 08520
T: (609) 469-2110
e-mail:  mtharney@s-tlawfirm.com
*Attorneys for Defendants/Counterclaimants/*
*Third-Party Plaintiffs,*
*TS of Kings Highway Inc. and Sean Nolan*