**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TSMA FRANCHISE SYSTEMS, INC., | |
| *Plaintiff*, | Civil Action No. 20-11088 (JMV) (JBC) |
| v. | **OPINION** |
| TS OF KINGS HIGHWAY INC. and SEAN NOLAN, | |
| *Defendants*. | |

TS OF KINGS HIGHWAY INC. and SEAN NOLAN,

*Counterclaimants/Third-Party Plaintiffs*,

v.

TSMA FRANCHISE SYSTEMS, INC.,
*Counterclaim Defendant*

and

DANIEL SCHULMANN, ANTHONY VISCOVICH, BRYAN GOTTHOFFER, MIKE SACHS, DINA COSTA, and RAY ROUSA,

*Third-Party Defendants*.

**John Michael Vazquez, U.S.D.J.**

This case concerns contractual disputes related to Tiger Schulmann Martial Arts franchises. The franchisor, Plaintiff TSMA Franchise Systems, Inc., claims that Defendants TS of Kings Highway Inc. and Sean Nolan breached the terms of a 2018 franchise agreement, resulting in a $1.5 million loss. Defendants, the franchisees, counterclaim that Plaintiff, its predecessor in

interest, and six individuals named as Third-Party Defendants breached other contracts between the parties and maintained an ongoing scheme to encumber Defendants with significant debt and avoid profit sharing.

Presently before the Court are two motions to dismiss Defendants' Counterclaims and Third-Party Complaint. The Court reviewed all the submissions in support and in opposition[1] and considered the motions without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b). For the reasons discussed below, the motions to dismiss are **GRANTED in part and DENIED in part.**

## I.    FACTUAL AND PROCEDURAL BACKGROUND[2]

Plaintiff TSMA Franchise Systems ("TSMA") is a Florida corporation with its principal place of business in Florida, CC ¶ 3; it owns the franchise to the Tiger Schulmann Martial Arts system. AA ¶ 1; D.E. 1-1 at ¶ 1. Defendant TS of Kings Highway Inc. ("TS of Kings" or "Franchisee") is a New York corporation with its principal place of business in New York,

---

[1] Plaintiff TSMA Franchise and Third-Party Defendant Bryan Gotthoffer's brief in support of their motion to dismiss will be referred to as "TSMA Br.," D.E. 15-2. Defendants' opposition brief will be referred to as "TSMA Opp.," D.E. 18. TSMA Franchise and Gotthoffer's reply brief will be referred to as "TSMA Reply," D.E. 18. Third-Party Defendants Viscovich, Sachs, and Costa's brief in support of their motion to dismiss will referred to as "TPD Br.," D.E. 21-1. Defendants' opposition brief will be referred to as "TPD Opp.," D.E. 22. And Viscovich, Sachs, and Costa's reply brief will be referred to as "TPD Reply," D.E. 23.

[2] The facts are taken from Defendants' Amended Answer, Separate Defenses, Counterclaim and Third-Party Complaint, D.E. 4, which "the Court accepts . . . as true and draws all inferences in the light most favorable to the non-moving party." *Duke Univ. v. Akorn, Inc.*, No. 18-14035, 2019 WL 4410284, at *1 (D.N.J. Sept. 16, 2019) (citing *Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008)). The Counterclaim and Third-Party Complaint portion of this pleading, D.E. 4 at 10-31, will be referred to as "CC." The portion of this pleading that serves as the Amended Answer and raises affirmative defenses, D.E. 4 at 1-10, will be referred to as "AA."

operated a Tiger Schulmann Martial Arts franchise. CC ¶ 1; AA ¶ 2. Defendant Sean Nolan is the sole shareholder of Franchisee. AA ¶ 3.

Defendants' Third-Party Complaint ("TPC") makes the following allegations upon information and belief concerning the residency of each Third-Party Defendant: Daniel Schulmann and Mike Sachs are individuals residing in Florida, CC ¶¶ 4, 7; Anthony Viscovich and Bryan Gotthoffer are individuals residing in New York, *id.* ¶ 5, 6; Dina Costa and Ray Rousa are individuals residing in New Jersey, *id.* ¶¶ 8, 9. Rousa is allegedly the "former controller" of "Plaintiff's predecessor." *Id.* ¶ 43. The TPC does not otherwise explicitly identify the roles or affiliations of the remaining Third-Party Defendants, however, the Court presumes that the Third-Party Defendants work or worked for Plaintiff or Plaintiff's predecessor.[3] *See id.* ¶¶ 21, 87. Viscovich was a previous owner of a Tiger Schulmann's located in Bensonhurst, Brooklyn and also appears to be affiliated with a Tiger Schulmann's located in Astoria, Queens. *Id.* ¶¶ 17, 38. Gotthoffer was or is the owner and head instructor of a Tiger Schulmann's located in Bayside, Queens. *Id.* ¶ 14. Sachs appears to have had some involvement in the opening of the Bensonhurst location, *id.* ¶ 32, and further appears to be a "principal[] and agent[]" of Plaintiff, with some involvement in facilitating Plaintiff's payments to Franchisee, *id.* ¶ 80. Costa also appears to be involved in Plaintiff's payments to Franchisee. *Id.* ¶¶ 78, 80.

Defendant Nolan began training at the Bayside location of Tiger Schulmann's in 2002 under Gotthoffer. *Id.* ¶ 14. Nolan worked for Gotthoffer as a "manager/instructor" "[f]rom 2007

---

[3] Plaintiff TSMA and Third-Party Defendant Gotthoffer indicate that the six Third-Party Defendants are individuals "who, at various times, have been connected to" TSMA, TSMA's predecessor TSK Franchise Systems, Inc., TS of Kings, and Nolan. TSMA Br. at 2.

3

through December of 2009." *Id.* ¶ 15. Nolan "learn[ed] the business from Gotthoffer and complet[ed] Tiger Schulmann's 'Instructor Training Program.'" *Id.*

In December 2009, Third-Party Defendant Schulmann told Nolan "that because of his excellent performance as a manager and instructor in Bayside, there was opportunity for him to become an owner/operator of the Bensonhurst Tiger Schulmann's location." *Id.* ¶ 16. At the time, the Bensonhurst location was owned and operated by Third-Party Defendant Viscovich and Will Malloy. *Id.* ¶ 17. Plaintiff's predecessor told Nolan that his partner in Bensonhurst would be Schulmann's cousin, Nissim Levy. *Id.* ¶ 18. Nolan was to purchase Viscovich's interest for $200,000, and Levy would take over Molloy's interest. *Id.* Defendants indicate that they are unaware of what sum Levy paid for his ownership interest. *Id.* Pursuant to the "Joint Franchise Agreement" in effect at the time of this purchase, Schulmann owned 51% of each location and received 50% of net profits; Nolan and Levy each possessed an approximate 25% interest in the Bensonhurst location. *Id.* ¶ 19.

In order for Nolan to finance the transaction, he borrowed $50,000 from Gotthoffer to use towards purchasing Viscovich's interest. *Id.* ¶ 20. Nolan executed a $50,000 promissory note to Gotthoffer and executed a second promissory note to Viscovich for the remaining $150,000 of the purchase price. *Id.* TSMA's predecessor's attorney prepared both promissory notes (the "Notes"). *Id.* Defendants allege that Nolan engaged in this transaction "in reliance upon numerous false and fraudulent misrepresentations made by Plaintiff . . . and [the] Third-Party Defendants," which were "designed to induce Sean Nolan to become encumbered with purported debt." *Id.* Specifically, Defendants assert the following:

> Plaintiff's predecessor and its principals and agents, including, but not limited to [the] Third-Party Defendants made misrepresentations concerning: (a) the value of the Bensonhurst location; (b) their

respective interests in the Bensonhurst location; (c) the valuation of Mr. Nolan's anticipated interest in the Bensonhurst location; (d) the actual amount of Mr. Nolan's ownership interest, as distinguished from what they would represent to the government and to the outside world; and (e) anticipated revenue and profits to be generated by the Bensonhurst location.

*Id.* ¶ 21. Defendants allege that, upon information and belief, the purpose of the fraudulent inducement was to "burden [Nolan] with unreasonable debt" to ensure that "Plaintiff's predecessor and its principals and agents could avoid their obligation to share profits with him, deprive him of the value of his franchise ownership interest, and to ensure their ability to draw on the significant revenue stream derived from his talents whenever they pleased." *Id.* ¶ 22.

In addition to the Notes, Defendants allege that Nolan was fraudulently induced to execute the Joint Venture Franchise Agreement in December 2009. *Id.* ¶ 23. This document was prepared by Plaintiff's predecessor's attorney. *Id.* Defendants allege that the same fraudulent misrepresentations detailed above were made by Plaintiff's predecessor and its principals and agents, including the Third-Party Defendants, so that Nolan would execute the agreement. *Id.* ¶ 24.

Shortly after Nolan and Levy took over the Bensonhurst location, in the spring of 2010, "Plaintiff's predecessor changed the business model and accounting method for all franchises, including the franchise operated by Sean Nolan, which led to a substantial decline in revenue and profits for all franchise owners." *Id.* ¶ 25. Under the prior business model, students purchased "class-based programs" and franchises recognized 100% of the cash collected for the number of classes sold in each month. *Id.* ¶ 26. The new business model was "subscription-based" and allowed students to take unlimited classes for a flat monthly fee. *Id.* ¶ 27. If a student paid for a one-year subscription in advance, the franchise "would recognize only a fraction of the revenue in

the month it was paid, and the remainder would only be earned in future moths as services were provided." *Id.* The accrued revenue under this model "would build in an account that was managed solely by Plaintiff's predecessor." *Id.* Defendants allege that "[t]he effect of this change in business model was to deprive Mr. Nolan of the income and value he was led to believe he would receive by Plaintiff's predecessor and its principals' and agents' representations regarding the value of the Bensonhurst location." *Id.* ¶ 28. Following the change in the business model, Defendants allege that "Gotthoffer and Viscovich verbally agreed to modify the purported Notes thereby allowing Nolan to pay if and when he could." *Id.* ¶ 29. Defendants allege that Nolan continued to rely on Plaintiff and the Third-Party Defendants' fraudulent statements and ultimately paid $80,994.86 on the Notes. *Id.*

While Nolan owned the Bensonhurst location, Defendants allege that he "received numerous requests from the landlord to cure pre-existing NYC Department of Buildings violations on the" building – one violation stated that the building "was not zoned for a 'Physical Culture Establishment.'" *Id.* ¶ 30. With respect to the violations, Defendants allege that Plaintiff's predecessor and its principals and agents "made fraudulent misrepresentations regarding their intent, willingness, and ability to resolve the zoning issue." *Id.* ¶ 31. At the time Nolan signed the Joint Venture Agreement, he was told by Plaintiff's predecessor's attorney that the zoning violation was not a problem and that Plaintiff's predecessor would take care of it; however, the issue was never remedied. *Id.* As a result of the failure to rectify the zoning violation, the Bensonhurst location was fined. *Id.* Defendants allege that, although unknown to Nolan at the time he "relied upon the fraudulent misrepresentations," "the Bensonhurst location was opened originally without the proper zoning approval[.]" *Id.* ¶ 32. "Third-Party Defendant Sachs later admitted that he and other . . . principals knew that the site was not properly compliant with zoning

6

requirements, and that they proceeded to operate the location despite that known failure to comply." *Id.* Defendants indicate that Nolan "was induced to purchase an interest in the Bensonhurst location and to enter into the purposed Notes" as a result of these "fraudulent statements by Plaintiff's predecessor and its principals and agents," including Schulmann, that the zoning violations would be handled. *Id.* ¶ 33.

Defendants also add that Plaintiff's predecessor misrepresented Nolan's ownership interest in filings with the IRS. *Id.* ¶ 34. Defendants point to 2010, when "Nolan only owned, and was paid as if he had, a 25% interest in the location," but Plaintiff's predecessor claimed that he possessed a 49% ownership interest. *Id.* Defendants continue that Plaintiff's predecessor indicated that Nolan owned a 99% interest in 2011 and 2012, but he still only owned, and was paid as if he owned, a 25% interest. *Id.* ¶ 35.

Defendants state that, without Nolan's input, Plaintiff's predecessor decided to close the Bensonhurst location in early 2012 as a result of the continuing zoning violations and in order to split up Nolan and Levy. *Id.* ¶ 36. While "Levy was given an already-active, thriving location in Bay Ridge," "Nolan was told that his new location would be a brand-new location in Midwood, Brooklyn." *Id.* ¶ 37. As a result of the closure of the Bensonhurst location, Viscovich and Gotthoffer "again confirmed their agreement to forgo any payments on the purported Notes until such time as Nolan could get back on his feet." *Id.* ¶ 38. For "much of 2012," Nolan worked for Viscovich at the Astoria location. *Id.*

Defendants further allege that "[i]n addition to other fraudulent misrepresentations, Plaintiff's 2018 Franchise Disclosure Document misrepresented that Bensonhurst was a company-owned location, thereby denying Nolan's 25% interest in Bensonhurst." *Id.* ¶ 39.

In December 2012, the Midwood location opened. *Id.* ¶ 40. The security deposit and first and last month's rent was paid by Schulmann, and Defendants paid back $32,750 within months of the opening. *Id.* ¶ 41. Only some of the costs associated with the buildout of this location were covered by the landlord's work allowance. *Id.* ¶ 42. Defendants allege that "[c]ontrary to the agreement and understanding of Plaintiff's predecessors and its principals' and agents' representations, Plaintiff's predecessor, through former controller Ray Rousa, misrepresented that Defendants were responsible" for some buildout costs that were included in the landlord's work allowance. *Id.* ¶ 43. This action, Defendants continue, "was a further effort by Plaintiff's predecessor and its principals and agents to ensure that Mr. Nolan was encumbered with significant debt" in order to "avoid their obligation to share profits with him, to deprive him of the value of his franchise, and to ensure their ability to draw on his talents and revenue stream whenever they pleased without fairly compensating Defendants." *Id.* ¶ 44.

Nolan, Schulmann, Gotthoffer, Viscovich, "and other executives of Plaintiff's predecessors" met in the spring of 2014 "to discuss payment on the purported Notes." *Id.* ¶ 45. Schulmann admitted during the meeting that Nolan paid too much to acquire his interest in Bensonhurst, "and asked how that happened." *Id.* ¶ 46. "Nolan reminded Schulmann that he had approved and dictated the terms of the deal in December of 2009." *Id.* Schulmann told Viscovich and Gotthoffer not to charge Nolan any interest on the Notes. *Id.* ¶ 47. Defendants allege that, "[u]pon information and belief, that gesture was nothing more than an attempt to hide Schulmann's pivotal role in the illicit scheme to deprive Sean Nolan of his rightful share of profits." *Id.* "[I]n reliance upon the numerous fraudulent statements and omissions perpetrated by Plaintiff . . . and its principals and agents," Nolan agreed at the meeting to make $500 monthly payments to Viscovich, and $250 monthly payments to Gotthoffer, beginning in the spring of 2015. *Id.* ¶ 48.

Defendants contend that this meeting and the insistence that Nolan begin making payment on the Note was part of the ongoing fraud scheme against Nolan. *Id.* ¶ 49.

Nolan ran the Midwood location until July 1, 2020, when he received a Termination of Franchise notice from Plaintiff. *Id.* ¶ 50. Pursuant to the Joint Venture Franchise Agreement, Defendants owned 49% of the franchise and Schulmann owned the remaining 51% for the first seven years of the arrangement. *Id.* ¶ 51. Contrary to these terms, Plaintiff and its predecessor reported to the IRS that Defendants owned 99.5% of the Midwood location in 2012, 2013, 2014, 2015, 2016, and 2017, and that Defendants owned 99.528767% in 2018. *Id.* ¶ 52.

In the summer of 2017, Defendants allege that the landlord of the Bensonhurst location sued Schulmann "in his capacity as guarantor on the lease for failing to satisfy Bensonhurst's obligations under the lease." *Id.* ¶ 53. At Plaintiff's predecessor's request, Nolan gave a deposition, however, "he did not otherwise participate and the decision to settle the litigation was made entirely by . . . Schulmann and Plaintiff's predecessor and its principals and agents." *Id.* ¶ 55. The litigation settled for $190,000. *Id.* ¶ 54. Defendants allege that the settlement payment "was only made as a result of the negligence, ineptitude and/or fraudulent misrepresentations of Plaintiff's predecessor and its principals and agents." *Id.* ¶ 56. "Plaintiff and its predecessor took the position that Nolan was liable for 50% of the settlement," and offered to reduce his share from $95,000 to $47,500 through a "Repayment Agreement." *Id.* ¶ 57. Nolan refused to sign the agreement because it was "the result of Plaintiff's and its principals' and agents' malfeasance." *Id.* ¶ 59. Nolan told Schulmann he did not have the money to pay; Schulmann responded that the funds would be taken out of Midwood's prepaid student tuition. *Id.* ¶¶ 59-60. Defendants contend that Plaintiff and its predecessor's position with respect to the litigation "is contrary to Plaintiff's representation in its 2018 Franchise Disclosure Document that the Bensonhurst location was

company-owned and lays bare Plaintiff and its principals and agents' scheme to encumber Sean Nolan with improper debt obligations in furtherance of their fraudulent scheme." *Id.* ¶¶ 58, 61. Ultimately, Nolan paid $15,000 of the $47,000 because of the duress he was under due to the alleged fraudulent scheme. *Id.* ¶ 62. Nolan also paid $500 to Plaintiff's predecessor's attorney to represent him during his deposition. *Id.* ¶ 63.

In the spring of 2018, Plaintiff and its predecessor "restructured the entire Tiger Schulmann's franchise system under a new franchise agreement." *Id.* ¶ 64. Pursuant to the restructuring, franchisees were required to buy out Schulmann's 51% interest "pursuant to a valuation performed by Plaintiff's CFO." *Id.* ¶ 63. The Midwood location's buyout price was $192,209. *Id.* ¶ 66. Nolan complained to Schulmann that the price was too high in light of the Notes for the Bensonhurst location and the portion of the Bensonhurst settlement Nolan owed. *Id.* ¶ 67. Schulmann agreed to give Nolan a $23,750 "credit." *Id.* Defendants allege that even with this credit, the buyout "placed yet another financial obligation on Defendants in furtherance of" Plaintiff's scheme against Defendants. *Id.* ¶ 68.

Under the new franchise structure, each location had two bank accounts – the first was a "Sterling Bank depository account" that Plaintiff controlled, and the second was a Bank of America operating account which the franchisee controlled. *Id.* ¶ 69. All the gross revenue from Defendants' location was deposited into the Sterling account. *Id.* Each week, Plaintiff would deduct 19.5% of gross revenue pursuant to the agreement, and the remaining 80.5% would be transferred into the Bank of America account. *Id.* ¶ 70. Franchisees were responsible for their own accounting and bookkeeping, which was a change from the previous system in which Plaintiff's predecessor handled the accounting. *Id.*

In light of the COVID-19 pandemic, Defendants were ordered by the City of New York to cease operations on March 16, 2020. *Id.* ¶ 71. Nolan reached out to the Midwood location's landlord that day to "explore the possibility of rent modification." *Id.* ¶ 72. The landlord refused but indicated that it would be willing to release Defendants from the lease. *Id.* Defendants allege that Nolan "began looking for another location with Plaintiff's knowledge and assistance. *Id.* While the Midwood location was shutdown, Defendants began teaching students on Zoom; however, the franchise received "a significant number of cancellation requests, which resulted in a precipitous drop in income for the location." *Id.* ¶ 73.

In late March and April 2020, Schulmann held web conferences with all franchisees. *Id.* ¶ 74. Because of COVID-19 shutdowns and the resulting revenue losses, Plaintiff indicated that it "would not charge the transaction fee/buyout payment for March and April of 2020 and instead [would] add those payments to the end of the payment schedule." *Id.* ¶ 74. In May 2020, Plaintiff instructed franchisees to withhold rent and utility payments "in order to have as much cash on hand as possible . . . to weather the shutdown." *Id.* ¶ 75. Plaintiff further directed franchisees to "furlough all employees and have them apply for unemployment." *Id.* ¶ 76. However, Plaintiff also told franchisees "to have those same employees 'volunteer for job security,' teaching Zoom classes while collecting unemployment, with the implication that if they did not comply, they would not be rehired after the COVID-19 shutdown ended." *Id.*

On June 5, 2020, the usual transfer of funds into the Bank of America account never came. *Id.* ¶ 77. In response to Defendants' inquiries, Plaintiff's controller, Third-Party Defendant Costa, indicated that there was an "issue" with the transfer file. *Id.* ¶ 78. On June 8, 2020, Defendants received $978.88 instead of the expected $12,696. *Id.* ¶ 79. Defendants allege that on June 9,

Costa and Sachs "advised that the remaining money could not be transferred from the Sterling account because there [were] not enough funds in the account to clear it." *Id.* ¶ 80.

Defendants were advised by Plaintiff's CFO "that the lack of adequate balance was the result of the remaining $32,500 that was still owed on the Bensonhurst settlement," and "encouraged Defendants to transfer PPP loan money" they received for their rent into the Sterling Bank account. *Id.* ¶ 81. Defendants refused because "they intended to use that money for the buildout of the new location that [they] had been working with Plaintiff to find." *Id.* Defendants allege that "even if they owed $32,500, there should have been roughly $23,000 available in the Sterling account based on deferred income that was due to accrue between June of 2020 and February of 2021." *Id.* ¶ 82. Defendants inquired, but were never informed, as to why such funds were not available. *Id.* Defendants continue that, upon review of their records, there were "unusual transfer patterns" in the Sterling account. *Id.* ¶ 83. Plaintiff sometimes took "nearly double what had been earned, effectively giving itself a 0% interest loan on pre-paid student tuition that had not been earned yet, as well as blatant errors in accounting practices." *Id.*

In June of 2020, "Defendants executed a release with the landlord at the Midwood location and closed the brick and mortar location, but continued to provide classes for students via Zoom." *Id.* ¶ 84. Defendants then received Plaintiff's Termination of Franchise notice on July 1, 2020. *Id.* ¶ 85. Defendants allege that the termination fraudulently misrepresented that Defendants had abandoned the franchise. *Id.* ¶ 86. Defendants submit that Plaintiff had actual knowledge that Defendants were providing classes on Zoom and working with Plaintiff – with Plaintiff's consent – to find a new physical location for the franchise. *Id.*

Plaintiff filed a Complaint against Defendants in the Superior Court of New Jersey, Law Division, Bergen County on July 21, 2020. D.E. 1-1. The Complaint includes claims for breach

of contract and unjust enrichment. *Id.* Defendants timely removed the action on August 21, 2020. D.E. 1. Defendants filed an Answer on August 28, 2020, D.E. 3, and an Amended Answer on September 15, 2020, D.E. 4, asserting separate defenses and the following nine counterclaims: breach of contract (Count One); breach of the implied covenant of good faith and fair dealing (Count Two); fraud (Count Three); negligent misrepresentation (Count Four); conversion (Count Five); tortious interference with contract (Count Six); tortious interference with prospective economic advantage (Count Seven); trade libel (Count Eight); and a declaratory judgment (Count Nine). CC ¶¶ 88-127.

Plaintiff TSMA Franchise and Third-Party Defendant Bryan Gotthoffer jointly filed a motion to dismiss the TPC (the "TSMA motion to dismiss"), D.E. 15-2, which Defendants opposed, D.E. 18, and to which TSMA Franchise and Gotthoffer replied, D.E. 19. In addition, Third-Party Defendants Anthony Viscovich, Mike Sachs, and Dina Costa moved to dismiss the TPC (the "TPD motion to dismiss"), D.E. 21-1, which Defendants opposed, D.E. 22, and to which Viscovich, Sachs, and Costa replied, D.E. 23.

## II.   STANDARD OF REVIEW

"Courts use the same standard in ruling on a motion to dismiss a counterclaim under Federal Rule of Civil Procedure 12(b)(6) as they do for a motion to dismiss a complaint." *RBC Bank (USA) v. Petrozzini*, No. 12-155, 2012 WL 1965370, at *2 (D.N.J. May 31, 2012); *see County of Hudson v. Janiszewski*, 351 F. App'x 662, 667-68 (3d Cir. 2009) ("Though we 'must accept all factual allegations in [the] complaint[, or in this case, the counterclaim,] as true, [ ] we are not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." (alterations in original) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007))). Under this standard, the counterclaim must contain sufficient factual

matter to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating the sufficiency of a counterclaim, the court must separate the factual and legal elements. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-211 (3d Cir. 2009). Restatements of the elements of a claim are legal conclusions, and therefore, are not entitled to a presumption of truth. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011). A court will, however, accept the counterclaim's well-pleaded facts as true. *Fowler*, 578 F.3d at 210.

On a Rule 12(b)(6) motion to dismiss, a district court may not consider information extraneous to the relevant pleading. Fed. R. Civ. P. 12(d). Similarly, a motion to dismiss a counterclaim must be decided "on the face of the counterclaim." *Lukoil N. Am. LLC v. Turnersville Petroleum Inc.*, No. 14-3810, 2015 WL 5455648, at *1 (D.N.J. Sept. 16, 2015). However, in certain circumstances, a court may also consider undisputed and authentic exhibits as well as matters of public record. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997).

## III. ANALYSIS

In an action based on diversity of citizenship, a federal court generally applies the choice-of-law rules of the jurisdiction in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Here, the parties agree that New York law applies to this action because the Franchise Agreement from which this matter derives states that all disputes will be governed by the law of the state of New York. D.E. 15-4 at 62.

### A. Breach of Contract

Defendants' breach of contract counterclaim asserts that Plaintiff and its predecessor breached the parties' agreements by: (1) "misrepresenting Defendants' ownership interests in the

Bensonhurst and Midwood entities"; (2) "failing to make payments to Defendants pursuant to the ownership interests so represented"; (3) "improperly assigning a portion of the Bensonhurst settlement liability to Defendants"; (4) "withdrawing money from the Sterling account to which they were not entitled"; and (5) "improperly seeking to terminate the Midwood franchise." CC ¶ 90. In opposition, Defendants clarify that the breach of contract claim is not asserted against the Third-Party Defendants, TPD Opp. at 15, so the Court only consider the count as to Plaintiff.

The TSMA motion to dismiss argues that "[a]ll of the claims relating to the Bensonhurst Location occurred approximately one decade ago," and highlights that the Bensonhurst location closed in 2012. TSMA Br. at 8. TSMA adds that any claims that Defendants' ownership interests in the Midwood location were misrepresented are barred because "this purported 'breach' occurred from the time the Midwood Location was initially opened in 2012." TSMA Br. at 9. Finally, all other claims related to the Midwood Location that pre-date July 21, 2014 (six years before this action was filed) must be dismissed as time barred, according to Plaintiff. *Id.* Defendants respond that Plaintiff ignores Defendants' allegations of an ongoing fraudulent scheme that began as early as 2009 and continued through at least June of 2020. TSMA Opp. at 15. Defendants contend that Plaintiff's "scheme was ongoing and that each breach, fraud, or other wrong was part of that ongoing scheme," and that "New York courts recognize the continuing wrong doctrine in the contract and torts contexts." *Id.*

"The statute of limitations is an affirmative defense." *Adie v. Stewart*, No. 20-6200, 2020 WL 7488897, at *2 (D.N.J. Dec. 21, 2020) (citing Fed. R. Civ. P. 8(c)(1)). "A complaint is subject to dismissal for failure to state a claim on statute of limitations grounds only when the statute of limitations defense is apparent on the face of the complaint." *Wisniewski v. Fisher*, 857 F.3d 152, 157 (3d Cir. 2017). Moreover, "a statute of limitations dismissal must consider the potential

15

applicability of tolling doctrines in an appropriate case." *Adie*, 2020 WL 7488897, at *2 (citing *Wisniewski*, 857 F.3d at 157-58). "[O]nly in the clear case where a plaintiff has plead itself out of court" will the statute of limitations support dismissal at the motion to dismiss stage. *Id.*

In New York, a breach of contract claim is subject to a six-year statute of limitations. N.Y.C.P.L.R. § 213(2). "New York does not apply the 'discovery rule' to statutes of limitations in contract actions." *ACE Sec. Corp., Home Equity Loan Trust, Series 2006-SL2 v. Structured Prods., Inc.*, 36 N.E.3d 623, 628 (N.Y. 2015). Instead, New York's "statutory period of limitations begins to run from the time when liability for wrong has arisen even though the injured party may be ignorant of the existence of the wrong or injury." *Id.* (internal quotation omitted).

"The continuous wrong doctrine is an exception to the general rule that the statute of limitations 'runs from the time of the breach though no damage occurs until later.'" *Henry v. Bank of Am.*, 147 A.D.3d 599, 601 (N.Y. App. Div. 2017) (quoting *Ely-Cruikshank Co. v. Bank of Montreal*, 615 N.E.2d 985, 986 (N.Y. 1993)). Usually, the doctrine is employed "where there is a series of continuing wrongs and serves to toll the running of a period of limitations to the date of the commission of the last wrongful act." *Id.* (quoting *Selkirk v. State*, 249 A.D.2d 818, 819 (N.Y. App. Div. 1998)). "The doctrine may only be predicated on continuing unlawful acts and not on the continuing effects of earlier unlawful conduct. The distinction is between a single wrong that has continuing effects and a series of independent, distinct wrongs." *Id.* (internal quotation omitted).

It is not apparent from the face of the TPC that Defendants' breach of contract claim is barred by the statute of limitations. Throughout the TPC, Defendants allege that Plaintiff and its predecessor had a scheme "to induce Sean Nolan to become encumbered with purported debt," CC ¶ 20, "to ensure that Plaintiff's predecessor and its principals and agents could avoid their

16

obligation to share profits with him, deprive him of the value of his franchise ownership interest, and to ensure their ability to draw on the significant revenue stream derived from his talents whenever they pleased," *id.* ¶ 22.  Defendants allege that each breach, fraud, and wrongful act was a part of the scheme.  *E.g.*, *id.* ¶¶ 20, 22, 44, 49, 58, 61, 68.  Plaintiff does not note the specific dates upon which breaches occurred to demonstrate that they are barred as a matter of law by the six-year statute of limitations.  As a result, the Court declines, at this stage, to dismiss Count One on the grounds of the statute of limitations.

Beyond the statute of limitations, Plaintiff raises one argument in a footnote of its brief attacking the sufficiency of Defendants' allegations related to the Bensonhurst lawsuit and settlement.  TSMA Br. at 9, n.6.  "[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived."  *John Wyeth & Brother Ltd. v. Cigna Int'l Corp.*, 119 F.3d 1070, 1076, n.6 (3d Cir. 1997).  As a result, the Court does not address this argument.[4]

### B. Breach of the Implied Covenant of Good Faith and Fair Dealing (Count Two)

In Count Two, Defendants allege that Plaintiff and its predecessor breached the implied covenant of good faith and fair dealing for the same five reasons detailed in the breach of contract claim.  CC ¶ 94.  In their opposition briefing, Defendants clarify that this claim is not asserted against the Third-Party Defendants and, therefore, the Court construes Count Two only as to Plaintiff.  TPD Opp. at 21.

The TSMA motion to dismiss argues that (1) this claim is duplicative of the breach of contract claim and (2) it is barred by the statute of limitations.  Plaintiff first argues that a claim

---

[4] Because Plaintiff has not otherwise challenged the breach of contract claim on plausibility grounds, the Court declines to address the issue *sua sponte*.

for breach of the implied covenant of good faith and fair dealing must be dismissed where it is duplicative of a breach of contract claim. TSMA Br. at 10-11. Here, Plaintiff avers, "the two causes of action not only arise from the same facts but incorporate the exact same language to describe the claim." *Id.* at 10. In opposition, Defendants argue that Count Two is pled in the alternative – to the extent Plaintiff's conduct did not breach the express terms of the parties' agreements, "it nevertheless undermined Defendants' rights to receive what they were entitled to under the agreements in violation of the implied covenant of good faith and fair dealing." TSMA Opp. at 21. "Double recovery of damages, of course, is not permitted, but what a claimant may recover is distinct from what a claimant may plead; Federal Rule of Civil Procedure 8(d) permits alternative and inconsistent pleading of claims." *Adie*, 2020 WL 7488897, at *3. At this stage of the case, the Court will not dismiss Defendants' counterclaim for breach of the implied covenant of good faith and fair dealing as duplicative. However, should Defendants prevail, they will not be permitted to recover duplicative damages.

With respect to the statute of limitations, Plaintiff argues that "to the extent the cause of action for implied covenant of good faith and fair dealing is based on the 2009 franchise agreement governing the Bensonhurst Location, is based on allegations that predate July 21, 2014 with respect to the Midwood Location, or is based on claims where no contract is identified, the claim must be dismissed." TSMA Br. at 10-11. This barebone argument fails to demonstrate that Defendants' claim for breach of the implied covenant of good faith and fair dealing is time barred as a matter of law.

### C. Fraud and Negligent Misrepresentation (Counts Three and Four)

Count Three alleges that Plaintiff and the Third-Party Defendants made material misrepresentations of fact on "numerous issues," including the following:

18

(a) the value of the Bensonhurst location; (b) their respective interests in the Bensonhurst location; (c) the valuation of Mr. Nolan's interest in the Bensonhurst location; (d) the actual amount of Mr. Nolan's ownership interest, as distinguished from what they would represent to the government and the outside world; (e) anticipated revenue and profits to be generated by the Bensonhurst location; (f) their willingness and ability to resolve the zoning issues at the Bensonhurst location and the fact that Mr. Nolan would not be responsible for such issues; (g) the extent of Defendants' responsibility for building costs for the new Midwood location; (h) the purported reason for their efforts to terminate Defendants' franchise; (i) the reasons for their failure to pay Defendants what was due and owing from the Sterling account; and (j) the improper and wrongful advance loans taken from the Sterling account to Defendants' detriment.

CC ¶ 97. Defendants assert a negligent misrepresentation counterclaim in Count Four and allege that Plaintiff and the Third-Party Defendants "made negligent misrepresentations of fact regarding numerous issues" and specifically identify the same list of issues cited above. *Id.* ¶ 102. Both the TSMA and TPD motions to dismiss argue that Counts Three and Four are duplicative of the breach of contract counterclaim and time barred. TSMA Br. at 11-14; TPD Br. at 11-15. The TPD motion to dismiss separately argues that these counterclaims should be dismissed because they fail to state a claim as to Viscovich, Sachs, and Costa. TPD Br. at 13, 15.

The TSMA and TPD motions first argue that neither a fraud claim, nor a negligent misrepresentation claim, can be sustained independently when it is inextricably related to a breach of contract claim. TSMA Br. at 11, 13; TPD Br. at 11, 14. They continue that the basis of the fraud allegations "are precisely the allegations that, in condensed form, are the basis of the breach of contract cause of action" – the alleged misrepresentations of fact concerning the Bensonhurst and Midwood locations; Nolan's ownership interests in each location; and the alleged withdrawal of money from the Sterling account. TSMA Br. at 11-12; TPD Br. at 12. And the negligent misrepresentation claim "is identical to the basis for the fraud cause of action." TSMA Br. at 13;

TPD Br. at 14.  As noted, because Defendants may plead in the alternative under Federal Rule of Civil Procedure 8(d), the Court will not dismiss Counts Three and Four as duplicative at this stage.

The TSMA and TPD motions next argue that the fraud and negligent misrepresentation claims are barred by the statute of limitations.  The moving parties make the same arguments that Plaintiff made with respect to the statute of limitations in Counts One and Two – that all allegations of fraud related to the Bensonhurst location, and all allegations related to the Midwood Location that predate July 21, 2014, should be dismissed as untimely.  TSMA Br. at 12, 14; TPD Br. at 12-13, 15.

N.Y.C.P.L.R. § 213(8) provides that as to fraud actions, "the time within which the action must be commenced shall be the greater of six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it."  The moving parties cite to allegations in the TPC in which Defendants submit that "[i]n spring of 2010," when Plaintiff's predecessor changed the business model and accounting method for all franchises, Defendants realized that his franchise "would recognize only a fraction of the revenue" it would have been due under the prior business model.  TSMA Br. at 12-13; TPD Br. at 13 (discussing CC ¶ 25-28).  The moving parties add that "the lion share of facts that comprise the identically drafted fraud and negligent misrepresentation claims all occurred approximately a decade ago."  TSMA Br. at 14.  In opposition, Defendants appear to concede that these allegations demonstrate that they discovered fraud related the "the anticipated revenue and profits" of the Bensonhurst location in the spring of 2010, however, they argue that the fraud and negligent misrepresentation claims allege additional improprieties that the moving parties fail to address.  TSMA Opp. at 16.

The Court agrees that the allegations concerning the change of business model in the spring of 2010 demonstrate that Defendants became aware at that time that they would not realize their anticipated profits in the Bensonhurst location. As a result, that allegation is not timely. Insofar as Counts Three and Four allege fraud and misrepresentations concerning the anticipated revenue and profits to be generated by the Bensonhurst location, they are dismissed. CC ¶ 97(e); ¶ 102(e). However, the Court also agrees that the moving parties have failed to demonstrate that the remaining fraudulent misrepresentations are barred by the statute of limitations. The moving parties state in conclusory terms that "items a-f all relate to the Bensonhurst Location (which alleged acts of 'fraud' relating thereto all occurred between 2009 and 2012) and closed in 2012"; item g "relates to the buildout of the Midwood Location which occurred in 2012"; and items h-j "all appear to relate to current Midwood Location issues" and are contract issues, not fraud issues. TSMA Br. at 12; TPD Br. at 13. The moving parties have failed to carry their burden and the motions to dismiss based on the statute of limitations are denied on those portions of Counts Three and Four. CC ¶ 97 (a)-(d), (f)-(j); 102 (a)-(d), (f)-(j).

The TPD motion separately argues that Counts Three and Four should be dismissed as to Third-Party Defendants Viscovich, Sachs, and Costa for failure to state a claim. TPD Br. at 13-14, 15. They allege that Defendants' allegations "fail[] to identify any misrepresentations of facts made by them," and the elements of fraud require a material misrepresentation of fact. *Id.* at 13-14. The same arguments are incorporated into the TPD motion to dismiss with respect to Court Four. *Id.* at 15.

Defendants respond that the TPC identifies "at least ten different intentional or negligent misrepresentations made by" these Third-Party Defendants. TPD Opp. at 22. In support, Defendants argue that the allegations contained in paragraphs 80-82 and 86-87 demonstrate that

21

Viscovich, Sachs, and Costa "actively participated in a fraudulent scheme to defraud" Defendants. TPD Opp. 22.

The allegations contained in the cited paragraphs fall short of sufficiently alleging a fraud claim against these three Third-Party Defendants. Defendants allege that on June 9, 2020, "Plaintiff, through Dina Costa and Mike Sachs, advised that the remaining money" that was to be deposited into Defendants' Bank of America operating account "could not be transferred from the Sterling account because there [were] not enough funds in the account to clear it." CC ¶ 80. Then, in "an ensuing telephone conference with Plaintiff's CFO," Defendants were told that the lack of an adequate balance in the Sterling account was the result of the $32,500 funds that were still owed on the Bensonhurst settlement." *Id.* ¶ 81. Defendants believed that based on their calculations, even if they still owed $32,500, about $23,000 should have been available in the Sterling account. *Id.* ¶ 82. Defendants allege that Plaintiff's fraudulent misrepresentations continued until it issued the Termination of Franchise notice that falsely claimed that Defendants abandoned the franchise, however. *Id.* ¶ 86. Defendants then make the conclusory allegation that Viscovich, Sachs, and Costa "actively participated in Plaintiff and its predecessor's scheme to defraud Defendants." *Id.* ¶ 87.

These allegations fail to plausibly plead that Viscovich, Sachs, and Costa committed fraud or made negligent misrepresentations. The statements made by Costa and Sachs about the Sterling account balance are not adequately alleged to be fraudulent or misleading. Moreover, other than the bare assertion that Viscovich was an active participant in Plaintiff's scheme, there are no allegations that sufficiently allege he made fraudulent or misleading statements (or otherwise participated in the scheme). As a result, the Court grants Viscovich, Sachs, and Costa's motion to dismiss Counts Three and Four of Defendants' counterclaims.

### D. Conversion (Count Five)

Defendants allege in Count Five that "the money that [they] paid allegedly as a result of the Bensonhurst settlement" and "[t]he money that Plaintiff and its principals and agents, including but not limited to Third-Party Defendants, improperly withdrew from the Sterling account" are identifiable sums of money that "belonged to Defendants and Defendants have an immediate right to possession of it." CC ¶¶ 106-08. The TSMA and TPD motions both assert that this claim is duplicative of the breach of contract claim and is barred by the statute of limitations. TSMA Br. at 14-15; TPD Br. at 16-17. The TPD motion separately argues that the claim should be dismissed as against Viscovich, Sachs, and Costa because no allegations implicate them. TPD Br. at 16, n5., 17.

The moving parties first argue that a conversion claim should be dismissed if it "raises no independent facts but is a mere restatement of the breach of contract cause of action." TSMA Br. at 14; TPD Br. at 16. Defendants reply that, although the conversion claim relates to the same subject matter as the breach of contract claim, the TPC "alleges additional conduct by the Moving Parties beyond the breach of the contract that takes their conduct from the realm of contract into the realm of tort." TSMA Opp. at 24-25; TPD Opp. at 25. Defendants specifically highlight allegations that demonstrate that the moving parties "exercised dominion and control over funds belonging to Defendants" by taking money out of the Midwood account for deferred revenue/pre-paid student tuition, CC ¶ 60, and by taking sometimes nearly double what was earned from the Serling account, thereby giving Plaintiff an interest-free loan, *id.* ¶ 83. TSMA Opp. at 25; TPD Opp. at 26. The Court agrees that Defendants do plead additional facts as to the conversion claim and, in any event, declines to dismiss the conversion claim at this stage.

23

The moving parties' second argument is that the conversion claim is barred by New York's three-year statute of limitations, N.Y.C.P.L.R. § 214(3). They argue that, according to the allegations in the TPC, the Bensonhurst settlement occurred in the summer of 2017 and the conversion counterclaim was filed on September 15, 2020. TSMA Br. at 15; TPD Br. at 17. Defendants do not address this argument in their opposition briefing, beyond general allegations of the ongoing scheme. *See* TSMA Opp. at 18-19. The moving parties point to paragraph 53 of the TPC which states that "[i]n the summer of 2017, the landlord of the Bensonhurst location sued Daniel Schulmann in his capacity as guarantor on the lease for failing to satisfy Bensonhurst's obligations under the lease." TSMA Br. at 15; TPD Br. at 17. However, that allegation indicates that the litigation was *initiated* in the summer of 2017; the TPC does not indicate the date on which the settlement was reached. *See* CC ¶ 54. If the settlement was also reached in the summer of 2017, then the moving parties would be correct that the conversion claim is barred by the statute of limitations; however, it is not apparent from the face of the TPC that Count Five is barred as a matter of law.

Finally, the Court considers whether Count Five is adequately pled against Viscovich, Costa, and Sachs. The TPD motion to dismiss contends that the TPC fails to allege what role, if any, Viscovich, Costa, and Sachs "played in the Bensonhurst settlement and does not state that [they] took money from bank accounts, only that they informed Nolan that there were insufficient funds." TPD Br. at 16, n.5, 17. Defendants do not appear to respond to this argument.

The conversion claim is predicated on (1) Defendants being made to pay a portion of the Bensonhurst settlement, and (2) Plaintiff and its principals and agents improperly withdrawing funds from the Sterling account. CC ¶¶ 106-07. "A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging

24

to someone else, interfering with that person's right of possession." *Colavito v. N.Y. Organ Donor Network, Inc.*, 860 N.E.2d 713, 717 (N.Y. 2006). "Two key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Id.* (internal citations omitted). The TPD motion to dismiss argues that the TPC "satisfies none of these elements" as to the Third-Party Defendants, and the Court agrees. Count Five is therefore dismissed as against Viscovich, Sachs, and Costa.

### E. Tortious Interference with Contract (Count Six)

Defendants allege in Count Six that Plaintiff and the Third-Party Defendants were aware of Defendants' ongoing relationship with their students and "intentionally interfered with it, by among other things, improperly attempting to terminate the Midwood franchise." CC ¶¶ 111-12. The TSMA and the TPD motions claim that Counts Six should be dismissed because it is duplicative of the breach of contract claim. TSMA Br. at 16; TPD Br. at 18-19. As detailed above, Federal Rule of Civil Procedure 8(d) permits pleading in the alternative. Therefore, the Court will not dismiss Counts Six as duplicative at this early stage of the litigation.

The moving parties separately argue that Defendants failed to state a cause of action as against Viscovich, Sachs, and Costa. TPD Br. at 19. To state a claim for tortious interference with contract, a plaintiff must plausibly allege "(1) the existence of a valid contract between the plaintiff and a third party, (2) the defendant's knowledge of that contract, (3) the defendant's intentional procurement of a third-party's breach of that contract without justification, and (4) damages." *Tri-Star Lighting Corp. v. Goldstein*, 151 A.D.3d 1102, 1106 (N.Y. App. Div. 2017) (quoting *Nagan Constr., Inc. v. Monsignor McClancy Mem. High Sch.* 117 A.D.3d 1005, 1006 (N.Y. App. Div. 2014). It appears that the alleged inappropriate conduct is Plaintiff and the Third-Party

Defendants' improper attempts to terminate the Midwood franchise. CC ¶ 112. However, the Court is not able to discern from the TPC what role, if any, Viscovich, Costa, and Sachs had in attempting to terminate that franchise. These allegations are not plausibly pled. As a result, the Court dismisses Count Six as against these three Third-Party Defendants.

**F. Tortious Interference with Prospective Economic Advantage (Count Seven)**

Count Seven is a claim for tortious interference with prospective economic advantage, which alleges that Plaintiff and the Third-Party Defendants were aware of Defendants' protectable interest in their prospective relationships with their students, and intentionally interfered with these relationships. CC ¶¶ 116-17. The TSMA and the TPD motions indicate that Count Seven should be dismissed because it is duplicative of the breach of contract claim and because Defendants failed to state a claim. TSMA Br. at 15-16; TPD Br. at 17-18.

"To establish a claim of tortious interference with prospective economic advantage, a plaintiff must demonstrate that the defendant's interference with its prospective business relations was accomplished by wrongful means or that [the] defendant acted for the sole purpose of harming the plaintiff." *Tsatskin v. Kordonsky*, 189 A.D.3d 1296, 1298 (N.Y. App. Div. 2020) (alteration in original) (quoting *Moulton Paving, LLC v. Town of Poughkeepsie*, 98 A.D.3d 1009, 1013 (N.Y. App. Div. 2012).

The TPC alleges that Defendants closed the physical Midwood location in June 2020 but continued to provide classes to students on Zoom. CC ¶ 84. On July 1, 2020, "Defendants received Plaintiff's purported Termination of Franchise notice and ceased teaching classes that day." *Id.* ¶ 85. Further, within the Termination of Franchise notice, Plaintiff allegedly falsely indicated that Defendants abandoned the franchise, despite knowing that Defendants were providing Zoom

classes while working with Plaintiff to find a new physical location for the franchise to continue once COVID-19 restrictions lifted. *Id.* ¶ 86.

Defendants reply that Plaintiff and Third-Party Defendants'' false statements constitute trade libel, which satisfies the wrongful means requirement of a tortious interference claim. TSMA Opp. at 27. Defendants further argue that "current and prospective students of the Midwood franchise would have to be notified why remote instruction was no longer available to them" which gives rise to the reasonable interference that the moving parties notified Defendants' current and prospective students that Defendants' had abandoned the franchise. *Id.* at 28. "[I]t is 'axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss," *Olson v. Ako*, 724 F. App'x 160, 166 (3d Cir. 2018) (quoting *Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988)), and the Court is unable to identify allegations in the TPC that support this assertion. As a result, Count Seven is dismissed for failure to state a claim and the Court does not reach the moving parties' remaining arguments on this counterclaim.

### G. Trade Libel (Count Eight)

Defendants bring a claim for trade libel in Count Eight, alleging that Plaintiff and the Third-Party Defendants "published false statements of fact regarding Defendants, including that Defendants had 'abandoned' the Midwood franchise" and did so knowing that the statements "were false or with reckless disregard for the truth." CC ¶¶ 121-22. The moving parties argue that this cause of action fails to state a claim. TSMA Br. at 19; TPD Br. at 21.

"The tort of trade libel or injurious falsehood requires the knowing publication of false and derogatory facts about the plaintiff's business of a kind calculated to prevent others from dealing with the plaintiff, to its demonstrable detriment." *Banco Popular N. Am. v. Lieberman*, 75 A.D.3d 460, 462 (N.Y. App. Div. 2010). The moving parties argue that the alleged false statement was

that Defendants "abandoned" the Midwood franchise, which is (1) not false, (2) not alleged to be published to a third party, (3) not an attack on Defendants' professional abilities.

Defendants contend that the statement was false and that it did constitute an attack on their professional abilities. TSMA Opp. 28-29; TPD Opp. 29-30. However, Defendants do not contest that the TPC fails to allege the statement was published to others. Instead, Defendants merely allege that Plaintiff and the Third-Party Defendants "published false statements of fact." CC ¶ 121. This conclusory allegation is insufficient and Count Eight is dismissed for failure to state a claim.

### H. Declaratory Judgment (Count Nine)

In Count Nine, Defendant seeks a declaration that the Notes are null and void "[b]ecause the purported Notes were induced by fraud, including, but not limited to, Plaintiff and its predecessors' and their principals' and agents' fraudulent statements regarding the value of the Bensonhurst franchise and Defendants['] interest in it." CC ¶ 126. Defendants seek a second declaration that the Midwood franchise agreement is null and void "[b]ecause Plaintiff has breached the Midwood franchise agreement, both actually and anticipatorily, by, among other things, improperly withdrawing money from the Sterling account that it was not entitled to and attempting to terminate the franchise." CC ¶¶ 127.

The TSMA and TPD motions both argue that "[i]nasmuch as the alleged fraudulent statements all occurred before 2012, this aspect of the declaratory judgment claim must be dismissed as time barred." TSMA Br. at 17; TPD Br. at 19. The moving parties do not identify the relevant statute of limitations, nor do they parse out what alleged fraudulent statements support this claim and identify the date on which they were made to demonstrate they are time barred. As a result, the motions to dismiss Count Nine are denied.

## I.  The TSK Release and the 2018 Franchise Agreement

The TSMA and TPD motions assert that "[a]ll claims relating to TSK, its affiliates, officers, shareholders, agents and employees must be dismissed because, on or about November 28, 2018, Nolan executed a release on behalf of TS of Kings, "which released TSK from all claims against it, including claims related to the Bensonhurst and Midwood locations."  TSMA Br. at 17; TPD Br. at 20.  The moving parties continue that "[i]nasmuch as TSMA is a successor of TSK Franchise Systems, Inc., this release must apply to all causes of action against TSMA for all alleged acts that occurred prior to the execution of the 2018 Franchise Agreement."  TSMA Br. at 18; TPD Br. at 20.  The moving parties add that "any claim that Nolan and/or Franchisee was somehow fraudulently induced into executing the Franchise Agreement are barred by the specific language in that agreement."  TSMA Br. at 18; TPD Br. at 21.

Defendants reply that the 2018 Release is outside the scope of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) and therefore not properly before the Court.  TSMA Opp. at 29; TPD Opp. at 30.  As for the Franchise Agreement, Defendants argue that the alleged fraudulent scheme "predates the 2018 Franchise Agreement by many years" and any exculpatory language in that document does not bar the claims asserted in this action because fraud transcended the entire franchise relationship and not just this one specific document.  TSMA Opp. at 30; TPD Opp. at 3.

As a general rule, "a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings."  *Jackson v. Grondolsky*, No. 09-5617, 2011 WL 6756918, at *4 (D.N.J. Dec. 23, 2011) (quoting *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 97 n.6 (3d Cir.2010)).  An exception to this rule permits "the Court [to] consider (1) exhibits attached to the complaint, (2) matters of public record, and (3) all documents that are integral to or explicitly

relied upon in the complaint without converting the motion to dismiss into one for summary judgment." *Id.* (quoting *D.G. v. Somerset Hills Sch. Dist.*, 559 F. Supp. 2d 484, 491 (D.N.J.2008)).

The TSK Release does not appear to be relied upon or referenced in the TPC. As a result, the Court will not consider it and denies the moving parties' motion in this regard. The 2018 Franchise Agreement is relied on in the TPC, however, the moving parties fail to specify the claims to which the document applies. As a result, the Court denies the motions on this ground.

## IV. CONCLUSION

For the reasons stated above, Defendants' motions to dismiss are **GRANTED in part and DENIED in part**. Counts Three and Four are dismissed insofar as they allege fraud and misrepresentations concerning the anticipated revenue and profits of the Bensonhurst location. Counts Seven and Eight are dismissed for failure to state a claim. Counts Three, Four, Five, Six are dismissed as to Third-Party Defendants Viscovich, Sachs, and Costa. All dismissals are without prejudice. Defendants have thirty (30) days to file an amended pleading cures the deficiencies notes herein. If Defendants do not file an amended pleading within that time, the claims dismissed without prejudice will be dismissed with prejudice. An appropriate Order accompanies this Opinion.

Dated: June 28, 2021

John Michael Vazquez, U.S.D.J.